## Case No. 17,777.

### WILMER v. The SMILAX.

[2 Pet. Adm. 295.] [1]

### District Court, D. Maryland. 1804.

BOTTOMRY — WHEN LIEN ATTACHES — DEVIATION.

[The bottomry lien attaches from the date of the bond, although the ship, by reason of the default of the parties procuring the loan, never performs the voyage described in the bond, but undertakes a different voyage; and the principal of the loan may be recovered in an action in rem. after the completion of that voyage, and as against a claimant who purchased the ship with knowledge of the facts.]

---

[1] [Reported by Richard Peters, Jr., Esq.]

The libel in this cause was founded on a bottomry bond for two thousand dollars, hazarded on a specified voyage, which voyage was never performed; but instead thereof, the vessel performed a different voyage, and was afterwards sold by Smith (who executed the bottomry) to Grace, the claimant, who alleged himself to be a bona fide purchaser, claiming an exemption from the bottomry, on two grounds—1st, that the bottomry never attached; and, 2dly, if it did attach, that the remedy thereon could not be pursued in rem. after an intermediate voyage, to injure a fair purchaser. The claimant wholly failed in the proof of his being a fair purchaser: indeed the evidence produced, afforded strong ground to presume that the sale set up was nominal and fraudulent; but his counsel strongly pressed the opinion that the bottomry never attached, as the contemplated risk was never run, and especially if it did, that not pursuing the remedy in time, that is, when the vessel returned to port, but permitting her to go a second voyage it could not now be pursued—there was no question raised as to maritime interest.

BY THE COURT.  Your argument amounts to this—that if a mortgagee, does not instantly on his debt falling due, take possession of the mortgaged premises, he loses his security. The hypothecation of a ship by the maritime law, is on the same footing as a mortgage of chattels on land is by the common law. And the plain distinction in cases of this kind, is between liens arising by implication of law, and those which result from express pledge: the former may be lost by parting with possession, on which they depend, or evidence of other equivalent circumstances, but the latter depend on very different rules. The bottomry stipulates, that the vessel shall, with all convenient speed, proceed upon the voyage on which the money was taken up, and if lost during that voyage, that the obligee shall lose his money. The objection that the bottomry did not attach is founded upon the defendant's own allegation, of the breach of his own contract and duty. I cannot conceive that that circumstance can alter the nature of the contract. It was originally a contract of bottomry, or it was not. If it was, the act of one of the parties, cannot alter its nature. The written contract is plainly a contract of bottomry; and it can never be permitted to a defendant, to rely upon his own default, to injure the rights and diminish the security of a fair creditor.

The libellant's counsel considering this case, like the case of an insurance, which does not attach where the contemplated risk has not been run, again pressed it on the court. I did not see sufficient cause to change my opinion. On mature deliberation and revision of that opinion, I can see no reason to think it erroneous. The contract of bottomry, has probably been in use from the earliest periods of foreign commerce, and its long recognition stands in the place of all reason, as it respects public policy. In questions resulting from that contract, as constituting the jus pignus vel hypotheca, the interest of individuals is more to be regarded than that of the public. And it is not to be doubted, that he who takes upon himself the hazard of loss for the benefit of another, will adopt the best method of securing himself, and look to all the securities the law allows, and in aid of that personal responsibility and sufficiency which the law creates by the very act of a loan, will rely on the thing. "Quia plus cautionis in re est, quam in persona." Dig. c. 106. The contract of bottomry may be either for a limited time, or upon a whole voyage; and in both, the lender has the same securities, to wit, the person of the borrower, and the thing on which it is loaned: and runs the same risk, to wit, a total loss, if his money is effectually hazarded. I say effectually, for it must be out of his own separate power to recall the hazard and rescind the contract; and I hold it to be effectually hazarded when the contract is once completed, and the employment of the money depends upon the sole volition of the borrower.

The general analogy between this species of contract and that of insurance is very striking, but there are some differences very material to be attended to. The insurer parts with no funds or property until the misfortune arrives. The lender on bottomry deprives himself of his funds and property from the moment of the contract, and risks their entire and total loss—he hazards his money too, to a person who by the application to borrow on bottomry, announces a decline or embarrassment of his affairs. The contract of insurance by its terms imports, that the obligation on the underwriters to make good a loss arises only when that loss happens. The contract of bottomry, on the other hand, implies an immediate pledge and security defeasible upon a future event: the first is a personal contract simply—the latter a contract of pledge, as well as personal security; in cases, therefore, between the insurer and the lender upon bottomry, the latter is preferred. There has not been, to my knowledge, any judicial decision upon the immediate question whether a bottomry in such a case attaches. Nor can I find such a question ever stirred by English elementary writers. A strong evidence that the objection is not solid, since the very term "bottomry" imports hypothecation by the maritime law; but there is much stronger evidence than any which results from the silence of jurists, to be drawn from principles which must be admitted to apply between insurers and lenders upon bottomry. I will suppose in this case for a moment, that the brig Smilax was insured for the voyage she actually sailed; and that upon her return voyage she was so materially injured by perils of the sea as to warrant an abandonment to underwriters as for a total loss, and a contest arose between the lender on bottomry, who should have the benefit of the salvage goods. If the insurer,

in this case, must give way, I think it will not be contended that the owner can stand against the bottomry creditor. That the insurer in such case, is to be postponed to the creditor on bottomry, is I think, very clear. By an abandonment, the insurer is placed in the situation of the insured whom he represents, and can have no greater right than the insured had. The lender upon bottomry loses remedy only when the ship, &c. is wholly lost; and where a part is preserved, they are esteemed as his proper goods, being presumed to be the product of his money. He therefore takes preference of the insurer. See 1 Valin, Comm. 262, iii. But in this case it is admitted, that if the voyage on which the money was intended to be hazarded, was not proceeded on, it resulted from the voluntary determination of the borrower. It cannot be denied, that when he undertook to perform that voyage, he virtually promised not to go on another, or exercise the lender's hazard. Good faith and common honesty required, at least, that he should not do any act to injure the lender, or increase his risks. The lender on bottomry looks for this integrity, and to the security so pledged. He is deceived in the honesty of the borrower, who may be insolvent, and upon that failure to discharge a moral duty, is attempted to be bottomed a principle which shall go to the further length of depriving the creditor of his security, on which he must be supposed principally to have relied. Thus by fraud, in the only act in his power, a foundation is laid to erect a more extended superstructure of iniquity, that the fraud which cannot be directly perpetrated, may nevertheless form a legal stock, on which to engraft other frauds, and produce more extensive injuries. Is there any case, or principle, or opinion, in any system of law, which will warrant a claim of protection, founded on an admitted violation of duty? Can there be any colour for such doctrine in a court of equity, and against a fair and equitable creditor?

Does the underwriter, or the lender upon bottomry insure the honesty of the man with whom he deals, or does the law hold out a temptation to him to commit iniquity that he may reap its fruits? The only hazard or peril which the insurer or lender upon bottomry runs, is the perils of the sea. They are answerable for no act of fraud or misconduct of the insured on the borrower. If they were at any time to be so affected, I can see no reason why at every period of the voyage they should not equally be affected. The true rule is, that the lender upon bottomry loses all remedy, if the vessel does not return to port, by perils of the sea, &c. or is lost without the fraud or fault of the owner. If a declining to proceed on the stipulated voyage at all destroys the hypothecary right of the lender, it would equally be destroyed if when she performed one half of the voyage, the borrower changed her route and destination. for in such case the whole risk. according to arguments of the claimant's counsel, was not run; and

the same reason would apply with equal force, in any case where the route was changed by the misconduct of the borrower, as carrying enemies' goods, being captured, taken out of her course, &c. or in any similar case. That the lender on bottomry has his remedy from the time of his contract, is not only proved by general principles—by the decisions that the borrower cannot insure his interest—that the lender may insure his principal—but by express decisions on the point.

On the 5th of September, 1754, Captain Candole borrowed of Mr. Barratier one thousand livres on bottomry of the polacre St. Estienne, giving his brother Francis Candole security for a voyage to the Levant, at the interest of ten pounds per cent. for six months, and so pro rata until her return, not exceeding three years. After navigating one year, the captain died at land, and the command of the vessel devolved on Faudon, his mate. In January, 1756, the vessel arrived at Cypress, the 20th of the same month, the crew presented a request to the French consul that the vessel might be examined, offering to re-embark if she was judged navigable. The examiners reported, that the vessel might sail many years, if refitted: the expense of a proper refit was estimated at from eleven to twelve hundred piastres. On the 23d, the consul ordered Faudon to proceed without delay to repair his vessel—he remonstrated that he had no money —the consul renewed his order. On the 3d of February, Faudon not being able to obtain the money necessary for repairing the vessel, declared that he abandoned the vessel to be sold by the consul, for the most advantage, to those interested. In consequence, the consul sold the vessel for nine hundred piastres, out of which he paid the crew. The purchaser refitted the vessel and employed her in commerce. On the 22d of June, 1756, the assignee of Barratier, the lender of bottomry. brought a suit against the heir of Captain Candole and his security, for the whole sum lent, together with the maritime interest up to the time of the sale. The defendant alleged that the vessel being unnavigable, the plaintiff could only recover the amount of sales, deducting the amount of wages, &c. The plaintiff replied, that the vessel was not found wholly unfit for sea, but only required repairs; and that if the captain had not found money to refit, it was a matter which concerned them only, and not the lender on bottomry or insurers. Upon this statement of facts. the admiralty of Marseilles, on the 19th of July. decreed for the whole sum lent. and the whole maritime interest.

This case is very peculiar—the length of time the vessel had been employed in navigation afforded strong presumption that the reparation which had become necessary was from the ordinary perils of the ocean. The original captain was dead; the substitute was at a very remote place, out of all probable correspondence with his owner—where credit might naturally be supposed difficult to obtain,—and where there was no imputation of

fraud or wilful misconduct. But it was a duty imposed by law on ship-owners who take up money on bottomry, or insure them, to keep them sea-worthy, from port to port. Going to sea when not properly provided, is an increase of the risk of the lender or insurer, which the owner has no right to produce. And, says Valin, in observing on this case, I have no doubt of the correctness of the judgment upon the facts stated. Such excuses are always suspicious; but if the insufficiency of the ship really arose from perils of the sea and was fully proved, it would justify the defendant.

Let this decision, and the facts on which it rest, be compared with the case before the court, and who will say that there is a pretext to support the claimant's defence? On this point Zouch is explicit (Elem. 398): "Item quæsitum est an fœnoris nautici præstatio evitanda sit, cum navigatio impedita est, culpa nautæ debitoris? Responsum. Quod ex præcipite debitoris audacia contingebat; creditori ascribi, publici juris rationem non permittere." And this is a consequence drawn from a rule of maritime law, derived from the civil law, which is a full answer to every argument of the risk not having been run, in consequence of the voluntary change of the voyage by Smith. "De conventione præstandi periculi quæritur, an id damnum prestandum sit, quod cui culpa sua contingit? Et visum quod qui navigationis periculum in se suscepit, intellegitur periculum quod casu, non quod culpa domini contingit in se suscipere." Z. E. 428. So in case of freight unladen before the voyage commenced. These principles are so strongly supported by all the considerations of equity, justice and moral rectitude, that I should reluctantly embrace a contrary rule—I feel very confident in their legal correctness, but even laying them out of the case, I think there is enough to support the decree.

The only ground taken to deprive the libellant of his lien, is, as before noticed, that the risk contemplated was not run. The evidence upon which the argument rests will not, on strict legal principles, warrant the inference deduced—What is the contract? The libellant loans to the owner of the Smilax, for her outfit to sea, the sum of two thousand dollars, on two conditions—one, that she shall with all convenient dispatch proceed to sea upon a specified voyage; and the other, that if lost in the prosecution of that voyage, the money loaned is not to be reimbursed.

The contract of pawning, or pledging, by way of bottomry, must necessarily precede the right to take possession of the ship, since that relates to future acts and events, which must take place before the ship can be seized or taken possession of. The right to exercise the power of reducing into possession, is necessarily contingent, but the right is not the less perfect when the contingency happens; the vessel must therefore be considered as mortgaged and bound from the date of the bottomry bond, to take effect in possession,

like any other contingent interest, when the contingency happens. It is an interest which he might lawfully insure, and would not be open to the objections of a wagering policy—I speak of the principal sum only. If the vessel had duly proceeded upon the stipulated voyage and performed it, it is not doubted but the libellant's claim would be sustainable. I cannot conceive a reasonable ground of discrimination between a case, where a right is admitted upon the happening of two contingencies upon which it is limited to take effect, and the case of a right limited to take effect upon the happening of one, out of two alternative events, on which it is limited to take effect, and which is the case before the court. The lender only authorized his money to be put at hazard upon a particular voyage, in the event that that voyage was proceeded upon with all convenient dispatch; but she did not proceed agreeably to the contract, on that voyage, but prosecuted another and different voyage. The right of the lender then, by the terms of the contract, to call for his money back, was complete the moment the vessel sailed upon the new voyage. But from the moment of the loan, until the time the vessel commenced her new voyage, the money was risked by the lender, and at least during that time, being at hazard, it was embraced by the contract.

It is to be remembered, that this opinion is applicable to the case of a libellant claiming a return of his loan, and does in no shape involve the consideration of the question of interest, or the power of this court to moderate maritime interest—agreeably to the circumstances, and in proportion to the actual hazard incurred by the lender.

WILMINGTON & N. R. CO. (KEMBLE v.). See Case No. 7,684.

WILMINGTON & R. R. CO. (RANDOLPH v.). See Case No. 11,563.

WILMOT (BARSTOW v.). See Case No. 1,066.

WILMOT (VANDOVER v.). See Case No. 16,848.